UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
                                :

HAROLD GATES,                    :

               Plaintiff,      :

                            :              20 Civ. 3186 (JPC)
       -v-                  :

                            :         <u>OPINION AND ORDER</u>

CITY OF NEW YORK et al.,      :

                            :

             Defendants.    :

--------------------------------------------------------------------X

        Plaintiff Harold Gates, a sergeant with the New York City Police Department ("NYPD"), alleges that Defendants the City of New York, Chief James Secreto, Deputy Inspector Tania Kinsella, Captain Dennis Gray, Lieutenant David DeJesus, and Lieutenant Jeffrey Gurley discriminated against him, subjected him to a hostile work environment, and retaliated against him based on a perceived disability, in violation of the Americans with Disability Act ("ADA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). Defendants filed a motion to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court grants Defendants' motion to dismiss but grants Gates leave to amend his ADA retaliation claim.

## I. Background

### A. Facts

        The following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Complaint and from Sergeant Gates's Equal Employment Opportunity Commission ("EEOC") charge, which is integral to the Complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (noting that at the motion to dismiss stage, a court may consider "any

written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as any documents "integral" to the complaint, *i.e.*, "where the complaint 'relies heavily upon [the document's] terms and effect'" (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995))); *Nelson v. Argyropoulous*, No. 18 Civ. 11413 (AT), 2020 WL 1244295, at *2 (S.D.N.Y. Mar. 16, 2020) ("In employment discrimination actions, the court can generally consider the contents of the plaintiff's EEOC charge, because it is integral to (and attached to) the complaint."); *Collins v. City of New York*, 156 F. Supp. 3d 448, 456 n.4 (S.D.N.Y. 2016) ("Collins' complaint explicitly referenced the EEOC charge and the EEOC charge is integral to the Complaint because it is a prerequisite to the ADEA cause of action.   Collins had actual notice of the contents of the EEOC charge because she wrote it. Accordingly, the Court may—and will—consider the EEOC charge in deciding Defendants' motion to dismiss." (citation omitted)); *Buczakowski v. 1199SEIU*, No. 18 Civ. 812 (LEK), 2019 WL 5697899, at *5 (N.D.N.Y. Nov. 4, 2019) ("It is appropriate to consider the EEOC Charge on a motion to dismiss because it is a public record and Plaintiff relied on it in her Complaint by attaching her right-to-sue letter.").

According to the Complaint, Gates worked for the NYPD as a police officer from 2007 to 2014, when he was promoted to sergeant.  Dkt. 1 ("Compl.") ¶¶ 22, 24.  On March 11, 2019, Gates was elected to be his unit's delegate for the Sergeants Benevolent Association ("SBA"), a police union.  *Id.* ¶ 25.  In this role, Gates was required to defend other sergeants in disciplinary proceedings within the NYPD.  *Id.* ¶ 27.  "Immediately" after he was elected, Deputy Inspector Kinsella "began to treat [Gates] with extreme hostility."  *Id.* ¶ 26.  Gates contends that Kinsella began to discipline him for violations he did not commit "because of [Gates's] union duties."  *Id.* ¶ 28.  Specifically, on August 13, 2019, Gates "was given Command Discipline for not having his

firearm in his holster." *Id.* ¶ 29.   At the time, Gates's gun was in his gun locker, as required by NYPD rules, because he was checking on prisoners.  *Id.*   On August 14, 2019, Gates "received an interim evaluation of 2.5 out of 5.0."  *Id.* ¶ 30.

On August 16, 2019, Kinsella asked to meet with Gates and Lieutenant Guang Zeng, who is not a party to this action.  *Id.* ¶ 32.   During this meeting, Gates "complained about the way he was being treated by Defendant Kinsella" and stated that "it was because of actions like that of Defendant Kinsella that leads police officers to kill themselves."  *Id.* ¶ 33.   After the meeting, Gates called the SBA "to assist him in his complaint with Defendant Kinsella."  *Id.* ¶ 34.   The SBA representatives met with Kinsella, after which they "informed [Gates] that he would be taken to the department psychologist for an interview."  *Id.* ¶ 35.   Gates then "realized that Defendant Kinsella created a disability that he was suicidal and was treating [Gates] as such."  *Id.* ¶ 36.   The Complaint alleges that "Defendant Kinsella essentially used the NYPD Patrol Guide procedure for suicide to harass and retaliate against [Gates]."  *Id.* ¶ 41.   Gates's firearms were taken from him, and he was driven to see a psychologist.  *Id.* ¶ 39.   The psychologist examined him for approximately two hours before informing him that he would be restored to full duty and have his firearms returned.  *Id.* ¶ 40.

After this incident, Gates "had his Union Delegate position taken away from him and he continued to be treated by Defendant Kinsella as if he had a disability even though he was cleared by the department psychologist minutes after being examined."  *Id.* ¶ 42.   He was transferred out of his unit and placed into a VIPER unit, which, Gates contends, is "well known throughout the NYPD" to be "severe punishment" because "promotional and overtime opportunities are

3

extremely limited." *Id.* ¶¶ 43-44.   Officers assigned to VIPER are considered "modified" and cannot carry a firearm.  *Id.* ¶ 45.

On August 29, 2019, Gates was transferred to PSA4, a unit in Manhattan, and on September 9, 2019, he was transferred to a new squad and given the midnight tour.  *Id.* ¶ 46.  He contends that he was "being compelled to undergo 'highway therapy' which is a punishment within the NYPD where officers are given assignments that are a long commute from their homes, generally much longer tha[n] the commute to their original post."  *Id.* ¶ 48.  Gates requested to be reassigned from the midnight tour to care for his father with Parkinson's disease, but this request was denied. *Id.* ¶¶ 49-50.  The Complaint asserts that this denial was "extremely unusual given the fact that [Gates] has been in the NYPD for thirteen (13) years and is considered to be a Senior Sergeant." *Id.* ¶ 50.  Gates alleges that when he started working at PSA4, Lieutenant DeJesus, PSA4's Integrity Control Officer, told Gates he had a "checkered" past and needed to "rehabilitate" himself.  *Id.* ¶ 52.

Then, from the end of September 2019 through February of 2020, Lieutenants Gurley and DeJesus began disciplining Gates "for extremely minor infractions and at times for no purpose at all."  *Id.* ¶ 53.  DeJesus began to "scratch [Gates's] memo book," a journal in which discipline notations are made, for "almost every interaction he had with [Gates]."  *Id.* ¶ 54.  Gates contends that these actions were "all on the basis of [his] perceived disability."  *Id.* ¶¶ 53, 55.

Gates filed an EEOC charge in November 2019 alleging "discrimination."  *Id.* ¶ 56; Dkt. 30 Exh. B ("EEOC Charge").  In his EEOC charge, Gates stated that he made the suicide comment to "express[] [his] concerns about bullying in the workplace driving officers to kill themselves." EEOC Charge ¶ 15.  He claimed that this was "union activity . . . made in furtherance of the defense of the mental health of fellow employees in the workplace."  *Id.*  Gates stated that Kinsella

and Chief Secreto, NYPD's Chief of Housing, Compl. ¶ 11, retaliated against him for making this comment based on "anti-union animus."  EEOC Charge ¶ 19.  Specifically, Gates asserted that the NYPD discriminated against him by "ordering [him] to be examined by an NYPD Psychologist"; "removing his firearms and police identification card"; "transferring him to VIPER out [of] his original command"; "again transferring him to Manhattan PSA4"; "changing his work tour from four-bys to midnights"; and "stripping him of his position as SBA union delegate."  *Id.* ¶ 2.

After Gates filed his EEOC charge, Gurley and DeJesus gave Gates scratch notations more frequently.  Compl. ¶ 56.  On February 5, 2020, DeJesus issued a command discipline to Gates for a "failure to supervise on October 30, 2019."  *Id.* ¶ 57.  On February 18, 2020, "DeJesus recorded in [Gates's] memo book that [Gates] was found 'out of uniform' and was instructed to go back on patrol," even though he was on a meal break at the time.  *Id.* ¶ 58.  The following day, Gurley informed Gates he was issuing a command discipline "for [Gates] taking unauthorized lost time." *Id.* ¶ 59.  "[Gates] had 4 more notations made in his memo book since then, the last one coming on March 5, 2020."  *Id.* ¶ 60.  Gates then interviewed for a position in the Community Affairs Division, but the Commanding Officer of his unit, Captain Gray, did not recommend Gates because of the command disciplines.  *Id.* ¶ 61.

## B. Procedural History

Gates filed suit on April 22, 2020.  Compl.  This case was initially assigned to the Honorable Andrew L. Carter.  This case was reassigned to the undersigned on September 29, 2020. *See* Dkt. 27.  Defendants filed their motion to dismiss on October 19, 2020.  Dkts. 28, 29 ("Motion"), 30.  Gates filed his opposition on December 8, 2020.  Dkt. 37 ("Opposition").

Defendants filed their reply on January 19, 2021.  Dkt. 40 ("Reply").  The Court held oral argument

on Defendants' motion to dismiss on August 17, 2021.

## II.  Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain

statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To

survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In deciding a motion to dismiss,

a court must "accept all allegations in the complaint as true and draw all inferences in the non-

moving party's favor," *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009)

(citation and internal quotation marks omitted), but is "not bound to accept as true legal conclusions

couched as factual allegations," *id.* at 475-76 (citing *Iqbal*, 556 U.S. 662).[1]

## III.  Discussion

Gates alleges that Defendants violated the ADA, the NYSHRL, and the NYCHRL by

(1) discriminating against him for his perceived disability of "depression/suicidal"; (2) creating a

hostile work environment; and (3) retaliating against him.  The Court begins with Gates's claims

under the ADA.  Because it concludes that Gates has failed to state a claim under the ADA, it does

not address his claims under the NYSHRL and NYCHRL.

---

[1] Defendants also state that they move pursuant to Rule 12(b)(1), which governs dismissal for lack of subject matter jurisdiction.  Motion at 1.  It is not clear what the basis for Defendants' motion under Rule 12(b)(1) is.  To the extent Defendants believe the Court lacks jurisdiction over any claims Gates did not administratively exhaust, the Court notes that, in the ADA context, "dismissal for failure to exhaust administrative remedies is more properly characterized as a dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6)." *McInerney v. Rensselaer Polytechnic Inst.*, 505 F.3d 135, 138 (2d Cir. 2007).

### A.  Liability of the Individual Defendants and the NYPD

At the outset, Defendants argue that Gates's ADA claims against the individual Defendants, *i.e.*, Secreto, Kinsella, Gray, DeJesus, and Gurley, must be dismissed because there is no individual liability under the ADA.  Motion at 5.  The Court agrees.  *See, e.g.*, *Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010) ("[I]n the context of employment discrimination, the retaliation provision of the ADA . . . cannot provide for individual liability."); *Darcy v. Lippman*, 356 F. App'x 434, 437 (2d Cir. 2009) ("Darcy may not sue these defendants in their personal capacities, because the ADA . . . like Title VII, do[es] not provide for actions against individual supervisors."); *Gomez v. N.Y.C. Police Dep't*, 191 F. Supp. 3d 293, 302-03 (S.D.N.Y. 2016) ("[T]here is no individual liability under the ADA.");  *Lane v. Maryhaven Ctr. of Hope*, 944 F. Supp. 158, 161-62 (E.D.N.Y. 1996) (collecting cases finding that there is no individual liability under the ADA based on Second Circuit's decision in *Tomka v. Seiler Corp.,* 66 F.3d 1295 (2d Cir. 1995), which held there is no individual liability under a similar provision of Title VII).  Accordingly, the Court dismisses Gates's ADA claims against the individual Defendants.[2]

Defendants also argue that the case must be dismissed as to the NYPD because the NYPD is a non-suable entity.  Motion at 5.  Defendants are correct that Gates cannot sue the NYPD directly.  *See Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) ("The district court correctly noted that the NYPD is a non-suable agency of the City."); N.Y.C. Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided

---

[2] However, for ease of reference, the Court uses the term "Defendants" throughout this Opinion and Order to refer to the individuals named in the Complaint, particularly where the Complaint does not attribute a certain action to a specific individual.

by law.").  However, Gates has not named the NYPD as a Defendant in this action, making dismissal unnecessary.

## B. Disability Discrimination

Gates contends that Defendants discriminated against him on the basis of the perceived disability "depression/suicidal."  Dkt. 25 at 2; Opposition at 5.  Title I of the ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . employee compensation . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  "The term 'disability' means . . . (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  *Id.* § 12102(1).  "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  *Id.* § 12102(3)(A).

"The elements of a claim under the ADA are that: (1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by [the plaintiff's] employer; (3) [the plaintiff] was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) [the plaintiff] suffered an adverse employment action; and (5) the adverse action was imposed because of [the plaintiff's] disability."  *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015).  "Under the last element, a plaintiff must show that the adverse employment action 'took place under circumstances giving rise to an inference of discrimination.'"  *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

Courts analyze ADA discrimination claims under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Davis*, 804 F.3d at 235. "Under that framework, once a plaintiff produces minimal evidentiary support for the claim of discriminatory motivation, the burden of production shifts to the employer to articulate a non-discriminatory reason for the adverse employment action." *Id.* "But once the employer has set forth its non-discriminatory justification, the plaintiff must then produce evidence capable of carrying the burden of persuasion that the employer's action was at least in part motivated by discrimination." *Id.*

To defeat a motion to dismiss, however, a plaintiff "is not required to plead a *prima facie* case under *McDonnell Douglas*." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015). Rather, a plaintiff must "alleg[e] facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* at 87. At the motion to dismiss stage, "the question is not whether a plaintiff is *likely* to prevail, but whether the well-pleaded factual allegations *plausibly* give rise to an inference of unlawful discrimination, *i.e.*, whether plaintiffs allege enough to 'nudge[] their claims across the line from conceivable to plausible.'" *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 570).

Gates has not alleged facts that give rise to a plausible claim of disability discrimination. As Defendants note, the "chronology set forth in plaintiff's Complaint undermines his claim," Motion at 7, particularly as to Kinsella. According to the Complaint, Kinsella began mistreating Gates over five months before the question of a disability ever arose. The Complaint alleges that "[i]mmediately" after Gates was elected to be an SBA delegate for his unit on March 11, 2019, Kinsella "began to treat [Gates] with extreme hostility." Compl. ¶¶ 25, 26. The Complaint directly attributes these actions to Gates's role in the union, stating that Kinsella "discipline[d] [Gates] for

violations [he] did not commit" "[b]ecause of [Gates's] union duties" and in an effort "to interfere with [Gates's] responsibilities as Union Delegate." *Id.* ¶ 28.

Indeed, the Complaint makes clear Kinsella never believed Gates was disabled.  To state a claim for discrimination based on a perceived disability under the ADA, the employer "must *regard* the employee as disabled within the meaning of the ADA." *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005) (emphasis added) (internal quotation marks omitted).  "A 'regarded as' claim turns on the employer's perception of the employee and is therefore a question of intent . . . ." *Id.* (internal quotation marks omitted) (quoting *Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998)); *see Thomsen v. Stantec, Inc.*, 483 F. App'x 620, 622 (2d Cir. 2012) (affirming the district court's grant of summary judgment where the plaintiff had testified that "he did *not* believe that anyone at Stantec perceived him as being substantially limited in any major life activity").  The Complaint alleges Kinsella "*created a disability* that [Gates] was suicidal," Compl. ¶¶ 35-36 (emphasis added), and "essentially used the NYPD Patrol Guide procedure for suicide to harass and retaliate against [Gates]," *id.* ¶ 41.  Gates's own allegations therefore make it impossible for the Court to infer that Kinsella regarded Gates as having a disability.

In fact, if Gates had alleged that Kinsella actually perceived Gates as suicidal, this would undermine the Complaint even further.  Gates admits that Kinsella acted in accordance with the NYPD Patrol Guide procedure for potentially suicidal employees.  *See id.*  Thus, Gates would be alleging that Kinsella discriminated against him when she—based on her genuine belief that Gates was suicidal—followed the NYPD's procedure for handling suicidal officers.  As Defendants rightly argue, sending Gates to a psychologist in such a situation would not amount to an adverse action.  Motion at 7-8; *see Forgione v. City of New York*, No. 11 Civ. 5248 (JG), 2012 WL

4049832, at *5 (E.D.N.Y. Sept. 13, 2012) ("Forgione's two referrals for psychological evaluation do not amount to adverse action under the ADA.  Although Forgione may have perceived the referrals as inconvenient and unwarranted, and although they may have carried negative connotations, they did not effect a materially adverse change in his working conditions."); *see also id.* at *5 n.5 ("Referrals for medical evaluation that are job-related and consistent with business necessities are expressly permitted by the implementing regulations of the ADA." (citing 29 C.F.R. § 1630.14(c))).  And this would certainly not give rise to a reasonable inference that Kinsella was motivated by any discriminatory intent.

In his opposition to the motion to dismiss, Gates responds that the "hostil[e]" treatment he received "prior to being sent for a psychological evaluation . . . in no way negates the fact that [Gates] was treated negatively once Defendants believed that he had a disability."  Opposition at 7.  He lists a range of what he contends are adverse actions, without attributing most of them to any Defendant in particular.  *See* Compl. ¶¶ 43-62.  To the extent that Kinsella took any of these actions, the Court cannot infer that she did so "because of" a perceived disability for the reasons stated above.  And to the extent others at the NYPD took these actions, Gates fails to allege that any of *those* individuals actually perceived him to be disabled.  Gates alleges only two facts that might cause someone at the NYPD to believe he was depressed or suicidal: his suicide comment during the August 2019 meeting and the subsequent referral to a psychologist.  *See id.* ¶¶ 32-33, 35-37.  But Gates does not allege that any Defendant other than Kinsella knew about these events.  *See Majied v. N.Y.C. Dep't of Educ.*, No. 16 Civ. 5731 (JMF), 2018 WL 333519, at *3 (S.D.N.Y. Jan. 8, 2018) (dismissing a complaint where the plaintiff "fail[ed] to allege any facts suggesting that Defendants treated her less well *because of* a disability").

Instead, the Complaint is rife with unsupported allegations that "[u]pon information and belief" Gates was discriminated against based on a perceived disability. *See, e.g.*, Compl. ¶¶ 47, 51, 55, 62. Gates's subjective belief that he was discriminated against due to a perceived disability is patently insufficient to state a claim. *See Majied*, 2018 WL 333519, at *3 ("Majied's subjective belief that she was treated differently on account of a disability is plainly not enough to state a claim."); *Smith v. Bronx Cmty. Coll. Ass'n*, No. 16 Civ. 3779 (JMF), 2017 WL 727546, at *2 (S.D.N.Y. Feb. 23, 2017) ("It is well established . . . that a plaintiff's subjective belief that she was the victim of discrimination, no matter how strongly felt, is insufficient to satisfy the burden to plead facts that could plausibly support an inference of discrimination.").

Even Gates admits that it "may be true" that he "cannot create an inference of discrimination merely by stating 'upon information and belief.'" Opposition at 7. Gates instead attempts to rely on a single remark from DeJesus, which he contends is a "clear reference" to his "perceived disability": "Defendant DeJesus told [Gates] that he has a 'checkered' past and that he has to 'rehabilitate' himself." *Id.* (citing Compl. ¶ 52). "As a general matter, verbal comments may raise an inference of discrimination, but not where they lack a 'causal nexus to the termination decision.'" *Luka v. Bard Coll.*, 263 F. Supp. 3d 478, 487 (S.D.N.Y. 2017) (quoting *Williams v. Victoria's Secret*, No. 15 Civ. 4715 (PGG), 2017 WL 1162908, at *8 (S.D.N.Y. Mar. 28, 2017)). "To determine whether a particular comment is probative of discriminatory animus or is a mere 'stray remark,' a court considers: '(1) who made the remark, *i.e.,* a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark . . . ; and (4) the context in which the remark was made, *i.e.,* whether it was related to the decisionmaking process.'" *Id.* (quoting *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004)).

Gates alleges that "[u]pon information and belief, Defendant DeJesus had supervisory authority over [Gates] and the ability to make decisions as to [Gates's] employment." Compl. ¶ 18. In fact, Gates alleges that "[u]pon information and belief," all of the named Defendants had "supervisory authority of [Gates] and the ability to make decisions as to [Gates's] employment." *See id.* ¶¶ 12, 14, 16, 20. Yet he does not allege any facts supporting any of these statements. But even assuming DeJesus did have decisionmaking authority over Gates, this alone is not dispositive. *See Luka*, 263 F. Supp. 3d at 487 ("Even if [the potentially discriminatory comments] had been made by a decisionmaker, however, that, 'without more, cannot prove a claim of employment discrimination.'" (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001))).

Critically, the Complaint does not allege that DeJesus made this statement in the context of any decisionmaking process. This was a single remark made in September 2018, during Gates's first week at work on a new unit. Compl. ¶ 52. The Complaint asserts that from the end of September, several weeks after this alleged comment, until February 2020, DeJesus "disciplined [Gates] for minor infractions, made disciplinary notations in his memo book, and gave him a command discipline." Opposition at 7; Compl. ¶ 53. But the Complaint does not allege any facts that reasonably tie these actions to the "checkered past" comment.

Most importantly, the content of DeJesus's comment is not probative of any discriminatory intent. Gates contends this comment was a "clear reference to [his] perceived disability." Opposition at 7; *see also id.* at 8 ("Defendant DeJesus was clearly and unequivocally referring to the disability that [Gates] was perceived to have when he told [Gates] that he needs to rehabilitate himself due to his checkered past."). But this comment, on its face, does not reference depression or suicidal ideation. In fact, it does not clearly reference a current trait at all, but rather Gates's "past." While Gates asks the Court to infer that this was a reference to Gates's "perceived

disability," the Complaint outlines what would more likely be considered a "checkered past"—Gates's history of disciplinary measures.  *See* Comp. ¶¶ 28, 29, 43, 44.  That this discipline may have been motivated by anti-union animus, as Gates alleges, does not help his disability discrimination claim.

Gates wants the Court to ignore this reasonable inference and presumably instead infer that DeJesus (1) knew about Gates's referral to a psychologist, (2) did not know the referral was done in retaliation for Gates's union activity, (3) inferred from the referral—and notwithstanding the psychologist's prompt recommendation that Gates be reinstated—that Gates was depressed and/or suicidal, (4) viewed this disability as constituting a "checkered past" from which Gates needed to "rehabilitate or reinvent himself," and (5) continued to harass Gates based on his perception that Gates was depressed and/or suicidal even though Gates did not do anything else to suggest he was depressed or suicidal.  *See id.* ¶ 52.  Gates simply does not allege any facts that would nudge this theory across the line to plausible.  "Where, as here, plaintiff has not pled any connection between a disability and an adverse employment action, dismissal is appropriate."  *Jackson v. Elmhurst Hosp. Ctr.*, No. 10 Civ. 5248 (RRM), 2012 WL 868965, at *6 (E.D.N.Y. Mar. 14, 2012).

In sum, taking Gates's own factual allegations as true, as the Court must, there is nothing to suggest Gates was discriminated against based on a perceived disability.  Because the Court concludes that Gates has failed to allege that Defendants actually perceived him as disabled or discriminated against him on that basis, the Court does not address Defendants' additional arguments for dismissal of this claim.  *See* Motion at 7-11.

## C. Hostile Work Environment

Gates also alleges that he was subject to a hostile work environment in violation of the ADA. *See* Compl. ¶¶ 80, 85, 90.  "[T]he Second Circuit has not decided whether a hostile work

environment claim is cognizable under the ADA.  District courts within this Circuit, however, have recognized such claims, applying the same standard applicable to hostile work environment claims under Title VII."  *Zabar v. N.Y.C. Dep't of Educ.*, No. 18 Civ. 6657 (PGG), 2020 WL 2423450, at *5 (S.D.N.Y. May 12, 2020) (alteration in original) (quoting *Garcia v. Kings Cty. Hosp. Ctr.*, No. 16 Civ. 3151 (ER), 2018 WL 389212, at *6 (S.D.N.Y. Jan. 11, 2018)); *see Robinson v. Dibble*, 613 F. App'x 9, 13 n.2 (2d Cir. 2015) ("We have not yet decided whether a hostile work environment claim is cognizable under the ADA.").

Defendants contend that Gates failed to exhaust his administrative remedies with respect to his hostile work environment claim, as he did not raise it in his EEOC charge.  Motion at 13; *see* EEOC Charge.  Gates fails to respond to this argument in his opposition.  *See generally* Opposition. Thus, Defendants encourage the Court to deem this claim abandoned.  Reply at 5.  "[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."  *Jackson v. Fed. Exp.*, 766 F.3d 189, 199 (2d Cir. 2014).  But while Gates failed to respond to Defendants' exhaustion argument, he did not fail to defend his hostile work environment claim *in toto*.  *See* Opposition 9-11.  While it would have been prudent for Gates to address a potentially dispositive defense raised in Defendants' motion to dismiss, the Court declines to find that Gates "abandoned" this claim.

The Court therefore addresses Defendants' exhaustion argument on the merits.  Defendants contend that a plaintiff "fails to exhaust his administrative remedies if the Complaint contains claims not included in the EEOC charge."  Motion at 13 (citing *Hoffman v. Williamsville Sch. Dist.*, 443 F. App'x 647, 649 (2d Cir. 2011)).  But that is not a complete statement of the law.  Even the one non-precedential summary order that Defendants cite in support states that "[a]n allegation not

set forth in an administrative charge will be barred as unexhausted *unless it is reasonably related to the allegations in the charge.*" *Hoffman*, 443 F. App'x at 649 (emphasis added).

"The exhaustion requirement is relaxed under the 'reasonably related' doctrine if, *inter alia*, 'the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Mathirampuzha v. Potter*, 548 F.3d 70, 76 (2d Cir. 2008) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003)).  In addition, a claim may be "sufficiently related to the allegations in the [EEOC] charge . . . where the complaint is 'one alleging retaliation by an employer against an employee for filing an EEOC charge'" or "where the complaint 'alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.'" *Terry*, 336 F.3d at 151 (quoting *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402-03 (2d Cir. 1993)).  The Second Circuit has made clear that "it is the substance of the charge and not its label that controls." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (quoting *Alonzo v. Chase Manhattan Bank, N.A.,* 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998)).

As is relevant here, the Second Circuit has emphasized that "[h]ostile work environment claims are different in kind from discrete acts." *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)).  "[A] hostile work environment is created '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 65, 67 (1986)).  Thus, an individual does not exhaust a hostile work environment claim by submitting an administrative claim alleging a "single act of

discrimination" with "no reference to repeated conduct or the cumulative effect of individual acts." *Mathirampuzha*, 548 F.3d at 76-77.

Here, the EEOC charge listed a single charge of discrimination, alleging the discrimination began and ended on August 16, 2019, the day of the meeting with Kinsella.  EEOC Charge at 1. However, the EEOC charge also alleged that Kinsella and Secreto reacted with "immediate-pure vengeance" to Gates's suicide comment and took various "swift-retaliatory actions" against Gates, including transferring Gates to the VIPER command and to PSA4.  *Id.* ¶¶ 17-19.[3]  These actions form, at least in part, Gates's hostile work environment.  *See* Opposition at 11.  And while the EEOC charge largely attributed these actions to "anti-union animus," EEOC Charge ¶ 19, it did allege that "the NYPD acted with *disability discrimination* and anti-union animus *by creating a disability* and then retaliating against [Gates]," *id.* ¶ 21 (emphasis added).

Thus, although Gates did not specifically allege he was subjected to a hostile work environment, this is not a situation where the EEOC charge "alleg[ed] a single act of discrimination."  *Mathirampuzha*, 548 F.3d at 76; *see id.* at 77 (finding the plaintiff had failed to exhaust a hostile work environment claim that his supervisor "subjected him to a hostile work environment by verbally harassing him since 1999 and denying him lunch breaks and assistance with his work" because the plaintiff's administrative complaint "contain[ed] no reference to repeated conduct or the cumulative effect of individual acts" and instead "recount[ed] nothing more than a single act of physical and verbal abuse").  The Court thus cannot say that Gates's claim that he was subject to a hostile work environment—at least as to his transfers—is so distinct from his claim that Kinsella discriminated against him, such that the former would not be covered by an

---

[3] The Complaint does not actually attribute any actions to Secreto.  It states only that "[u]pon information and belief, Defendant Secreto approved all of Defendant Kinsella's actions." Compl. ¶ 38.

EEOC investigation into the latter.  *Cf. Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 71 (2d Cir. 2006) (finding it error to have dismissed a claim for failure to exhaust administrative remedies "because the factual underpinnings of a gender discrimination claim were presented in the complaint made to the EEOC").

However, this is only true to the extent Gates's hostile work environment claim is based on Kinsella's actions.  But his claim is not so limited.  Gates also contends that he suffered from a hostile work environment because he was "disciplined for the most minor of infractions[] and given command disciplines" by DeJesus and Gurley.  Opposition at 11 (citing Compl. ¶¶ 53-54, 59-60). But the EEOC charge, which was filed several months after this alleged mistreatment began, is devoid of any reference to DeJesus or Gurley.  In fact, it does not mention that Gates suffered any discriminatory or hostile behavior at all after he was transferred to PSA4.  *See Barroso v. Off. of Gen. Couns.*, No. 12 Civ. 625 (RRM), 2013 WL 4048496, at *4 (E.D.N.Y. Aug. 9, 2013) (finding that a plaintiff who had brought an EEOC charge alleging discrimination based on a "discrete interview by a particular individual" could not bring claims "relat[ing] to specific allegations against other individuals presumably occurring at different times").  "[O]ne can hardly say that the EEOC likely would have investigated wholly disparate incidents, individuals and allegations of discrimination and retaliation now referenced in plaintiff's complaint."  *Id.*  Accordingly, to the extent Gates brings a hostile work environment claim based on allegations against DeJesus and Gurley, he has not exhausted his claim in *that* respect.

And to the extent Gates has exhausted his hostile work environment claim, it nonetheless fails on the merits.  To establish a hostile work environment claim under the ADA, "a plaintiff 'must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or

abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [disability].'" *Forgione*, 2012 WL 4049832, at *7 (alterations in original) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)). As noted above, the Complaint does not allege anyone actually perceived Gates as disabled, and therefore necessarily "does not plead facts suggesting that Defendants 'create[d] [a hostile work] environment *because of the [P]laintiff's disability*.'" *Zabar*, 2020 WL 2423450, at *6 (alterations in original) (emphasis added) (quoting *Forgione*, 2012 WL 4049832, at *7).

The Court thus dismisses Gates's hostile work environment claim as well.

## D. Retaliation Claim

Finally, Gates brings a claim for retaliation. To prevail on an ADA retaliation claim, a plaintiff must ultimately prove that "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 148 (2d Cir. 2002) (internal quotation marks omitted); *accord Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 89 (2d Cir. 2010). But "[t]o survive a motion to dismiss, 'the plaintiff must plausibly allege that: (1) [his employer] discriminated—or took an adverse employment action—against him, (2) "because" he has opposed any unlawful employment practice.'" *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 149 (E.D.N.Y. 2018) (alteration in original) (quoting *Vega*, 801 F.3d at 90); *see also Pahuja v. Am. Univ. of Antigua*, No. 11 Civ. 4607 (PAE), 2012 WL 6592116, at *11 (S.D.N.Y. Dec. 18, 2012) (noting that to survive a motion to dismiss, "a plaintiff need only allege facts that could establish a causal nexus between a protected activity and the adverse employment action" (citing *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012))).

### 1. Protected Activity

The exact nature of Gates's "protected activity" is somewhat nebulous.  The Complaint conclusorily states that Gates "was subjected to retaliation in that he was given numerous disciplinary notations as well as two command disciplines as a result of his participation in a protected activity."  Compl. ¶ 95.  In his response to Defendants' pre-motion letter, Gates asserted that he was retaliated against for filing an EEOC charge.  Dkt. 25 at 3.  Then, for the first time in his opposition to dismissal, Gates argued that he "engaged in protected activity from the time of his first complaint that he made to Defendant Kinsella on or about August 16, 2019," after which "the treatment he was receiving only got worse and more intense."  Opposition at 13-14.

A "'[p]rotected activity' is 'action taken to protest or oppose statutorily prohibited discrimination.'"  *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)), *cert. denied*, 140 S. Ct. 2668 (2020).  Defendants do not dispute that the filing of an EEOC charge is a protected activity.  *See* Motion at 15-16.  However, Defendants contend that Gates's discussion with Kinsella was not a protected activity.  *See* Reply at 6-7.  The Court agrees.  Gates does not allege that during this meeting he took any action to "protest or oppose statutorily prohibited discrimination."  *Natofsky*, 921 F.3d at 354 (quoting *Cruz*, 202 F.3d at 566).  Rather, he states that he "complained about the way he was being treated by Defendant Kinsella," Compl. ¶ 33, and he specifically alleges that Kinsella mistreated him "[b]ecause of [his] union duties," *id.* ¶ 28.  Indeed, Gates would not have had any reason to complain of any discrimination under the ADA at that time:  His entire theory is that it was after that meeting that Kinsella "created" his disability.  *Id.* ¶ 36.  Gates therefore cannot state a claim for retaliation based on this meeting with Kinsella.

2. **Adverse Employment Actions**

Because the Complaint alleges that DeJesus and Gurley took actions against him following his filing of the EEOC charge, the conduct of those individuals could potentially form the basis of a retaliation claim.  Defendants contend, however, that Gates's retaliation claim still must fail because (1) the EEOC charge and the command disciplines are too attenuated to give rise to an inference of retaliatory motivation and (2) he has not alleged that DeJesus or Gurley knew of the EEOC complaint.  *See* Motion at 15-17.

In order to address Defendants' first argument, the Court must initially identify what adverse employment actions are at issue.   In the context of an ADA retaliation claim, an adverse employment action is one that would be "likely to deter victims of discrimination from complaining to the EEOC, the courts, and employers."  *Anand v. N.Y. State Dep't of Tax'n & Fin.*, No. 10 Civ. 5142 (SJF) (WDW), 2013 WL 3874425, at *9 (E.D.N.Y. July 25, 2013) (quoting *Taylor v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 3582 (JG), 2012 WL 5989874, at *9 (E.D.N.Y. Nov. 30, 2012)); *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (concluding that "the scope of [Title VII's] antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm" but only "protects an individual . . . from retaliation that produces an injury or harm"); *Pistello v. Bd. of Educ. of Canastota Cent. Sch. Dist.*, 808 F. App'x 19, 23 (2d Cir. 2020) (applying *Burlington* in the ADA context).  By contrast, "courts have found reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse actions in [the] retaliation context."  *Anand*, 2013 WL 3874425, at *9 (internal quotation marks omitted).

As Defendants point out, the majority of the allegations regarding "retaliation" occurred before Gates filed the EEOC charge.  Motion at 15-16; Compl. ¶¶ 41, 47, 51, 55.  In this respect, the Complaint appears to conflate retaliation and discrimination, stating that Gates was retaliated

against "based upon his perceived disability." *See, e.g.*, Compl. ¶ 47 ("Upon information and belief, all of these transfers were to further harass and retaliate against [Gates] based upon his perceived disability."). Any of Defendants' actions before Gates filed the EEOC charge cannot, of course, form the basis of his retaliation claim. *See Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely *followed in time* by the adverse action.'" (internal quotation marks omitted) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996))); *see, e.g.*, *Mathirampuzha*, 548 F.3d at 78 n.7 ("The plaintiff did not file an [administrative] complaint until after his encounter with Sacco on September 29, 2003, so he cannot argue (nor does he) that Sacco's conduct was in retaliation for filing the [administrative] complaint.").

However, Gates does allege that he was subjected to several allegedly retaliatory acts after he filed the EEOC charge. *See* Compl. ¶ 95 ("[Gates] was subjected to retaliation in that he was given numerous disciplinary notations as well as two command disciplines as a result of his participation in a protected activity."). Specifically, the Complaint alleges that after Gates filed the EEOC charge in November 2019, DeJesus and Gurley began to issue scratch notations "on almost daily a basis," *id.* ¶ 56, and issued two command disciplines in February 2020, *id.* ¶¶ 57-60. The first command discipline was for a "failure to supervise on October 30, 2019," issued "3 months after the purported violation," *id.* ¶ 57, and the second was for taking "unauthorized lost time," *id.* ¶ 59. Gates alleges that his supervisor did not recommend him for a new position because of these command disciplines. *Id.* ¶ 61.

While Gates suggests that both the scratch notations and command disciplines were adverse actions, courts regularly find that a reprimand without adverse consequences is not an adverse employment action. *See, e.g.*, *Fletcher v. ABM Bldg. Value*, 775 F. App'x 8, 14 (2d Cir. 2019)

22

("Fletcher's disciplinary write ups were not adverse employment actions because they were only notices and did not result in disciplinary action.").  The scratch notations, as alleged, do not rise to the level of adverse employment actions, as Gates does not allege he was subject to any adverse consequences from these notations.

By contrast, Gates has alleged facts suggesting that the command disciplines were adverse employment actions.  Defendants assert "there is no allegation that the command disciplines have any lasting impact on [Gates]."  Motion at 8 n.6.  But Gates has alleged that the pending command disciplines caused his supervisor to not recommend him for a new role.  Compl. ¶ 61.  Gates has thus alleged that the command disciplines were adverse actions.  *Compare Smith v. City of New York*, No. 16 Civ. 9244 (JGK), 2018 WL 3392872, at *4 (S.D.N.Y. July 12, 2018) (finding that the plaintiff had stated a discrimination claim based on allegations that command disciplines "were placed in a permanent record that is consulted when her employer is considering changes to her pay or promotions") *with Arroyo-Horne v. City of New York*, No. 16 Civ. 03857 (MKB), 2018 WL 4259866, at *14 (E.D.N.Y. Sept. 5, 2018) (concluding the plaintiff had not alleged that a command discipline was an adverse employment action based on an allegation that "generally . . . such disciplinary actions can affect job opportunities," as the plaintiff "ha[d] not alleged that they have specifically affected *her* job opportunities"); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) ("Lesser actions such as negative employment evaluation letters may also be considered adverse.").

With this in mind, the Court can address Defendants' argument that the EEOC charge and the command disciplines are too tenuously connected to lead to an inference of retaliation.  "At the prima facie stage, causation may be shown: '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as

disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 150-51 (E.D.N.Y. 2018) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  And while temporal proximity alone can be enough to survive a motion to dismiss, it "must be 'very close.'"  *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 441 (E.D.N.Y. 2015) (quoting *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001)).

Although "[t]here is no 'bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship,' . . . 'courts in this Circuit have often found that a temporal gap of approximately three months between the protected activity and the adverse action, without more, prohibits an inference of causation.'"  *Id.* (first quoting *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2009); and then quoting *Nadel v. Shinseki,* 57 F. Supp. 3d 288, 299 (S.D.N.Y. Sept. 30, 2014)); *see also Hollander v. Am. Cyanamid Co.,* 895 F.2d 80, 85-86 (2d Cir. 1990) (finding three-month gap, without more, insufficient to show causation).  Here, Gates was not given the command disciplines until three months after he filed the EEOC charge.  In light of this, Gates cannot rely on temporal proximity alone to state a claim for retaliation.

Moreover, any causal connection is further undermined by Gates's allegation that DeJesus and Gurley mistreated Gates before he ever filed the EEOC charge.  *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").  The alleged mistreatment began at "the end of September 2019," approximately two months before Gates filed the EEOC charge.  Compl. ¶ 53.  At this point, Gurley and DeJesus were "disciplining [Gates] for extremely minor

infractions and at times for no purpose at all." *Id.*  The exact extent of any increase in mistreatment is not particularly clear:  After Gates filed the EEOC charge, DeJesus apparently went from "scratch[ing] [Gates's] memo book . . . regarding almost every interaction he had with [Gates]," *id.* ¶ 54, to making the notations "on almost a daily basis," *id.* ¶ 56.  And Gates was issued one command discipline before the question of a disability ever arose, *id.* ¶ 29, and two command disciplines after he filed the EEOC charge, *id.* ¶¶ 57, 59.

While prior mistreatment does not immunize Defendants from a claim for retaliation, the Complaint here is simply devoid of any factual allegations suggesting a causal connection between the EEOC charge and the command disciplines.  Gates does not allege that DeJesus or Gurley fabricated the charges underlying the command disciplines, and while Gates argues for the first time in opposition to dismissal that he was subject to "selective enforcement of rules and disciplinary measures," Opposition at 14, he has not alleged any facts supporting this.

Finally, and most importantly, the Complaint does not allege facts suggesting that DeJesus and Gurley even knew about the EEOC charge.  For either DeJesus or Gurley to have retaliated against Gates because of his filing of the EEOC charge, they of course needed to have knowledge of that charge.  *See Smith v. City of New York*, No. 12 Civ. 3250 (JMF), 2013 WL 1903856, at *5 (S.D.N.Y. May 8, 2013) (dismissing a retaliation claim where the plaintiff did not allege that her supervisor "w[as] aware that she filed the complaints or that she was terminated because she filed them"); *Anand*, 2013 WL 3874425, at *10 (dismissing a retaliation claim in part because "nothing in the Second Amended Complaint states or suggests that . . . any of the . . . individual defendants knew about the EEOC complaint and were motivated by it"); *see also Majeed v. ADF Cos.*, No. 11 Civ. 5459 (SJF) (ETB), 2013 WL 654416, at *11 (E.D.N.Y. Feb. 20, 2013) ("A complaint that makes only a general conclusory statement that the defendant retaliated against the plaintiff, and

that fails to provide any factual detail describing the specific acts of retaliation, when it occurred and which employee of the defendant had knowledge of the plaintiff's protected activity or actually engaged in the claimed retaliation, is insufficient to withstand a motion to dismiss.").

In sum, Gates has not alleged sufficient facts giving rise to an inference of retaliatory intent. As such, his retaliation claim must also be dismissed.

## E. State Law Claims

Having dismissed the only federal law claims, the Court declines to exercise supplemental jurisdiction over Gates's remaining state and city law claims. A district court has discretion to exercise supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). It is well established, however, that generally "when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (per curiam) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Here, the traditional "values of judicial economy, convenience, fairness, and comity" do not weigh in favor of exercising jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). This case is at an early stage, and discovery has not even begun. The Court therefore dismisses Gates's state and city law claims without prejudice to refiling in state court. *See* 28 U.S.C. § 1367(c)(3); *TRB Acquisitions LLC v. Yedid*, No. 20 Civ. 552 (JMF), 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021).

## F. Leave to Amend

Gates "requests the right to amend any allegation that this Court deems to be lacking." Opposition at 15. Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a). "This permissive standard is consistent

with [the Second Circuit's] 'strong preference for resolving disputes on the merits.'" *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)).   However, leave to amend should generally be denied "in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008).   "[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied." *Hayden v. County of Nassau*, 180 F.3d 42, 53-54 (2d Cir. 1999) (citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 76 (2d Cir. 1998), *cert. denied*, 525 U.S. 1103 (1999)).

Gates contends that "[a]ny proposed amendment would not be futile as they would seek to bolster any claims that [Gates] has made and would only further [Gates's] allegations so as to survive a motion to dismiss."  Opposition at 15.  But Gates provides absolutely no indication in his opposition what additional facts he would plead that would be sufficient to survive another motion to dismiss.  *See Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) (finding no abuse of discretion in denying leave to amend where "counsel did not advise the district court how the complaint's defects would be cured").

The Court concludes that any amendment to Gates's discrimination and hostile work environment claims would be futile, as Gates's allegations, even fully credited, simply do not sound in discrimination under the ADA.  Gates was not able to raise any facts during oral argument that would alter this conclusion.  Gates's discrimination and hostile work environment claims under the ADA therefore are dismissed with prejudice.  However, in light of the Second Circuit's liberal standard, and because Gates suggested during oral argument that he would be able to plead

additional facts to support a claim of retaliation, including that Gurley and/or DeJesus had knowledge of his filing of the EEOC charge, the Court will allow Gates 30 days to amend his ADA retaliation claim.  Specifically, Gates may amend his Complaint to add facts that would give rise to a reasonable inference that (1) Gurley and DeJesus knew about Gates's EEOC charge and (2) retaliated against Gates because of it.  Gates may also replead his state and city law retaliation claims.  If Gates elects not to amend his Complaint within 30 days of this Opinion and Order, the Court will also dismiss Gates's ADA retaliation claim with prejudice.

## IV.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion to dismiss but grants Gates leave to amend his ADA retaliation claim.  The Clerk of the Court is respectfully directed to terminate the motion pending at Docket Number 28.

SO ORDERED.

Dated: August 25, 2021
       New York, New York

_____
JOHN P. CRONAN
United States District Judge